IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| GERARDO GRANADOS AYALA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:11-cv-624 |
| | ) | |
| J.W. WOLFE, II, and LEXINGTON POLICE DEPARTMENT, | ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

This matter is before the Court on Plaintiff Gerardo Ayala's Motion for Leave to Amend Complaint and Defendants' Motion for Summary Judgment. On July 12, 2010, Mr. Ayala was shot by J.W. Wolfe, II, a police officer for the Lexington Police Department ("LPD"). The shooting left Mr. Ayala paralyzed. Mr. Ayala asserts an excessive force claim against Officer Wolfe pursuant to 42 U.S.C. § 1983, an excessive force claim against LPD under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and state law claims against Officer Wolfe. Because Mr. Ayala pulled a gun on Officer Wolfe before Officer Wolfe shot him and because "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences," *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996), summary judgment for the Defendants is appropriate.

**I.    STANDARD OF REVIEW**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of establishing the basis for its motion, and identifying the parts of the record

"which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)).[1] The non-moving party then must show a genuine issue of material fact and present more than a mere scintilla of evidence supporting the non-moving party's case. *See, e.g.*, *Shaw v. Shroud*, 13 F.3d 791, 798 (4th Cir. 1994). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## II. BACKGROUND

The evidence viewed in the light most favorable to Mr. Ayala establishes the following facts. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

On July 12, 2010,[2] at approximately 1:45 a.m., Officer Wolfe responded to a report of an armed robbery at a restaurant in Lexington, North Carolina. (Doc. 21-1 at ¶¶ 1, 2.) The report indicated that three armed men had robbed the restaurant and fled on foot. (Doc. 21-1 at ¶ 2.) Officer Wolfe began to canvass the area in his patrol car and saw a man, later identified as Mr. Ayala, walking in the street a few blocks from the scene of the robbery. (Doc. 21-1 at ¶ 2-3.)

Officer Wolfe stopped his patrol car to speak with Mr. Ayala. (Doc. 21-1 at ¶ 3.) During a protective frisk, Officer Wolfe felt a handgun in Mr. Ayala's pants. (Doc. 21-1 at ¶ 4; Doc. 21-2 at 6-8.) Officer Wolfe moved away from Mr. Ayala and drew his service weapon, saying nothing. (Doc. 21-1 at ¶ 4; Doc. 21-2 at 8.) Mr. Ayala then removed the gun from the waistband of his pants with his right hand, using three fingers. (Doc. 21-2 at 11.) Mr. Ayala did not tell

---

[1] The language of Rule 56 was amended effective December 1, 2010; however, the substance of the rule did not change, and the movant's burden remains the same.

[2] The complaint identifies the date of the incident as June 12, 2010. (Doc. 1 at ¶ 11.) However, both Mr. Ayala and Officer Wolfe testified that the date was July 12, 2010. (Doc. 24-1 at ¶ 4; Doc. 21-1 at ¶ 2.)

Officer Wolfe that he was going to remove the gun from his waistband. *Id*. When Officer Wolfe saw the gun in Mr. Ayala's hand, Officer Wolfe shot Mr. Ayala. (Doc. 21-1 at ¶ 6.)

Officer Wolfe fired several shots at Mr. Ayala. (Doc. 21-1 at ¶ 6; Doc. 21-2 at 13.) The first bullet hit Mr. Ayala's right hand, knocking the gun to the ground. (Doc. 24-1 at ¶ 14.) Another bullet entered on the rear left side of Mr. Ayala's body, hit his spine, and caused him to be paralyzed from the mid-chest down. (Doc. 21-8 at 3-4; Doc. 21-9 at 8-9.) The last gunshot came several seconds after the other shots, which occurred in quick succession to each other. (Doc. 24-2 at ¶ 4; Doc. 24-3 at ¶ 4.)

### III. ANALYSIS

#### A. THE EXCESSIVE FORCE CLAIM AGAINST OFFICER WOLFE

Mr. Ayala brings an excessive force claim under 42 U.S.C. § 1983, alleging that Officer Wolfe violated his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution by using unreasonable, excessive, deadly, and unlawful force. He asserts three separate excessive force actions. First, he contends that Officer Wolfe used excessive force by shooting Mr. Ayala. Second, he contends that Officer Wolfe used excessive force by continuing to fire after the first shot knocked the gun from Mr. Ayala's hand. Third, he contends that Officer Wolfe used excessive force by shooting Mr. Ayala after he had fallen to the ground. Officer Wolfe contends that he did not use excessive force, and, regardless, that he is entitled to qualified immunity.

"The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'" *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (*quoting Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006)). "Claims that law enforcement officers used excessive force . . . 'should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001)

3

(quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see Henry*, 652 F.3d at 531 ("Whether an officer has used excessive force is analyzed under a standard of objective reasonableness.") When determining whether an officer used excessive force, "[t]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson*, 247 F.3d at 129. "A police officer may use deadly force when the officer has 'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.'" *Id.* (quoting *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)).

The doctrine of qualified immunity shields public officials from civil liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *accord Johnson v. Caudill*, 475 F.3d 645, 650 (4th Cir. 2007). When evaluating a claim of qualified immunity, courts consider two questions: (1) "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right;" and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)) (citations omitted); *accord Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). Courts have discretion to consider these questions in the order most appropriate for the specific case. *Pearson*, 555 U.S. at 236.

Whether a right is "clearly established" turns on whether "it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted." *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002) (internal quotation marks and citations omitted). A right is "clearly established" if it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks omitted). Thus, qualified immunity is

designed to protect officers from claims when they make "reasonable mistakes as to the legality of their actions." *Saucier*, 533 U.S. at 206, *overruled on other grounds by Pearson*, 555 U.S. 223. Qualified immunity is meant to protect against liability for "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

### 1. THE INITIAL SHOOTING

A reasonable officer in Officer Wolfe's position would have concluded that a threat existed justifying the use of deadly force when Mr. Ayala pulled a gun on Officer Wolfe. *See Anderson*, 247 F.3d at 129. In *Anderson*, the officer believed that Anderson was armed with a gun based on a citizen's report as well as the officer's own observation of a bulge at Anderson's waistband. *Id.* at 130. The officer approached Anderson and ordered him to put his hands over his head. *Id.* Anderson began lowering his hands in the direction of the bulge at his waistband. *Id.* The Court concluded that "[a]ny reasonable officer in [the officer's] position would have imminently feared for his safety and the safety of others." *Id.* at 131. Because the officer had reason to believe that Anderson was armed, the officer "acted reasonably by firing on Anderson as a protective measure before directly observing a deadly weapon." *Id.* The Fourth Circuit reiterated that "an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action." *Id.* at 131.

Mr. Ayala contends that he was holding the gun with only three fingers and was therefore not a threat to Officer Wolfe. However,

> the Fourth Amendment does not require omniscience. Before employing deadly force . . . [o]fficers need not be absolutely sure . . . of the nature of the threat or the suspect's intent to cause them harm—the Constitution does not require that certitude precede the act of self protection.

*Elliott*, 99 F.3d at 644.

In this case, the undisputed evidence shows that in the early morning hours on a dark street shortly after an armed robbery nearby, Mr. Ayala removed a gun from his pants while

5

standing only a few feet from Officer Wolfe. Officer Wolfe was not required to wait until the gun was pointed at him before firing. *See Anderson*, 247 F.3d at 131. Officer Wolfe saw a gun in Mr. Ayala's hand, and any reasonable officer in the same circumstances would have concluded that a threat existed, justifying the use of deadly force. *See id.* at 129. As a matter of law, Officer Wolfe did not use excessive force and no constitutional violation occurred.

In the alternative, even if shooting Mr. Ayala after he drew his gun constitutes excessive force, Officer Wolfe is entitled to qualified immunity. In *Slattery v. Rizzo*, the officer was attempting to arrest Slattery in a parking lot where there had been past violent incidents. 939 F.2d 213, 214-15 (4th Cir. 1991). Slattery was sitting in the passenger seat of a car when the officer drew his service weapon and opened the passenger side door. *Id.* at 215. Slattery had his left hand partially closed around an object, but the officer could not identify the object. *Id.* The officer ordered Slattery to put his hands up. *Id.* Slattery then turned his upper body towards the officer, who still could not see what was in Slattery's hands. *Id.* Believing that Slattery was coming at him with a weapon, the officer shot him. *Id.* It was later found that the object was a beer bottle. *Id.* The Fourth Circuit held that a reasonable officer in the situation could have believed that Slattery posed a deadly threat and would have been authorized to use deadly force. *Id.* at 216-17. Therefore, the officer was entitled to qualified immunity. *Id.* at 217.

Just as in *Slattery*, a reasonable officer in Officer Wolfe's position could have feared for his safety when Mr. Ayala removed the handgun from his pants. Therefore, Officer Wolfe is entitled to qualified immunity from any claim that he should not have fired after Mr. Ayala pulled his handgun from his pants.

### 2. AFTER THE FIRST SHOT

Mr. Ayala contends that after the first shot knocked the gun from his hand, Officer Wolfe used excessive force in continuing to shoot at Mr. Ayala. Mr. Ayala asserts that it was clearly

6

established "that an officer may not continue to use deadly force seconds after the threat is eliminated, if a reasonable officer would have recognized when the force was used that the threat no longer existed." (Doc. 24 at 7.) He relies on *Brockington v. Boykins*, 637 F.3d 503 (4th Cir. 2011).

In *Brockington*, the defendant police officer shot the unarmed plaintiff twice, after which the plaintiff fell off a porch and was unable to move. *Id.* at 505, 507. The officer then stood over the plaintiff and shot him six more times "execution style." *Id.* at 507. It was undisputed that the initial use of deadly force was appropriate under the circumstances, but the plaintiff asserted that the second group of shots fired after he was on the ground was excessive force. *Id.*

In finding that the complaint should not have been dismissed for failure to state a claim, the Fourth Circuit held:

> There is no indication that deadly force was necessary or reasonable once Brockington was initially shot, thrown to the ground by the force of the bullets, and wounded. Furthermore, precedent suggests that it is possible to parse the sequence of events as they occur; while a totality of circumstances analysis still remains good law, if events occur in a series they may be analyzed as such. Drawing all inferences in favor of Brockington from the allegations in the SAC, there was a clear break in the sequence of events. Brockington's injuries may have been evident to Boykins after Brockington fell off the porch onto the concrete backyard below. Further, it is alleged that Boykins stood above Brockington execution style while fully discharging his clip so that gun powder residue got on Brockington's hands while Brockington waved away Boykins, further evincing the excessive nature of the force used. Whether or not Boykins thought his life was still in jeopardy is a fact that will be educed through discovery since it is unclear from the record before us. Again drawing all reasonable inferences in favor of Brockington, he was unarmed.

*Id.* (citations omitted). *Brockington* is distinguishable because the facts as alleged at that early stage in the case showed the plaintiff was unarmed and also showed a "clear break" in the sequence of events before the plaintiff was shot. *See id.*

7

This case is much more similar to *Maradiaga v. Wilson*, in which two seconds passed between the sixth and seventh shots fired by the officer, and there was nothing in the record that indicated that the officer knew the plaintiff had dropped his weapon. 518 F. Supp. 2d 760, 768 (D.S.C. 2007), *aff'd per curiam*, 272 F. App'x 263 (4th Cir. 2008) (unpublished). On those facts, the *Maradiaga* court granted summary judgment for the officer. *Id.* at 771.

In this case, all of the evidence is that Mr. Ayala was armed and pulled a gun from his pants. Both Officer Wolfe and Mr. Ayala agree that it was late at night and dark. Officer Wolfe testified that the muzzle flash obscured his vision, and that he had no idea whether the first shot knocked the gun out of Mr. Ayala's hand. Officer Wolfe was looking at the center of Mr. Ayala's body when he was firing, as he was trained to do. Mr. Ayala offers no evidence to the contrary, and indeed admits that he has no idea what Officer Wolfe could see after his first shot, that he does not know whether the gun made any noise when it fell, and that he did not say anything to Officer Wolfe about the gun being knocked from his hands. Moreover, all of the evidence is that all of Officer Wolfe's shots occurred within a very short period of time, no more than a few seconds apart.[3]

In his Declaration, Officer Wolfe testified that, "[i]t looked like Mr. Ayala was preparing to shoot me, and I believed that I was in imminent, mortal danger. Mr. Ayala never said

---

[3] While there is some disagreement between the witnesses as to the exact timing between the various shots, there is no disagreement that events occurred very quickly. Mr. Ayala testified that there were "some seconds" between the first shot and the rest of the shots, but he does not know how long. (Doc. 21-2 at 13.) He said the remaining shots were fired "quickly" after that first shot. (Doc. 21-2 at 15.) Other witnesses, who heard the shots but did not see the shooting, said there was a group of shots, followed by a short gap of four to five seconds, then one final shot. (Doc. 24-2 at ¶ 4; Doc. 24-3 at ¶ 4.) The Court has not located anything explicit in the record detailing Officer Wolfe's version of how long the shooting took, but it is apparent from his affidavit that it was a continuous event. (Doc. 21-1 at ¶ 6 ("I fired my service weapon at Mr. Ayala. I continued to fire until Mr. Ayala went down to the ground."); Doc. 21-1 at ¶ 8 ("When I saw Mr. Ayala fall to the ground, I immediately stopped shooting.")). These "minor discrepancies" do not create a disputed question of material fact. *See Anderson*, 247 F.3d at 131.

anything to me about his intentions, and I feared for my life." (Doc. 21-1 at ¶ 5.) There is no evidence that Officer Wolfe's fears were unreasonable, and this is not a case where the forensic or physical evidence is inconsistent with the officer's testimony. *See Ingle v. Yelton*, 439 F.3d 191, 194-195 (4th Cir. 2006); *see Anderson*, 247 F.3d at 130 (holding that summary judgment is appropriate when there is "uncontroverted evidence as to what [the officer] perceived immediately before firing").

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

*Matsushita Elect. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote omitted); *see also Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita*, 475 U.S. at 586-87). "A reviewing court may not employ 'the 20/20 vision of hindsight' and must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving.'" *Elliott*, 99 F.3d at 642 (quoting *Graham*, 490 U.S. at 396-97).

The facts viewed in the light most favorable to Mr. Ayala are insufficient to establish a constitutional violation. Even if they are, it would not have been clear to a reasonable officer that continuing to fire was unlawful in the situation he confronted,[4] and Officer Wolfe is entitled to qualified immunity. *See Figg*, 312 F.3d at 635.

### 3. THE "LAST SHOT"

Mr. Ayala continues his reliance on *Brockington*, contending that there was a "clear break" between the first group of shots and the last shot, and asserting that Officer Wolfe fired the last shot after Mr. Ayala had fallen to the ground and was no longer a threat to Officer Wolfe. (Doc. 1 at ¶ 13; Doc. 24 at 5.) He thus contends that this "last shot" constituted excessive force.

---

[4] The Fourth Circuit's decision in Brockington was issued after the shooting at issue in this case.

9

Mr. Ayala admits that he cannot offer any testimony about what happened after he fell to the ground because he passed out.  (Doc. 21-2 at 18-21.)  Officer Wolfe testified that when he saw Mr. Ayala fall to the ground, he immediately stopped shooting.  (Doc. 21-1 at ¶ 8.)

In support of his contention that this "last shot" occurred while he was on the ground and after a "clear break," Mr. Ayala offers his own testimony that "I was not shot in the back while I was standing up or while I was falling to the ground," to support his assertion that the shot to his back must have occurred after he fell down.  (Doc. 24-1 at ¶ 23.)  He also offers testimony from two witnesses inside a nearby house who heard several gunshots, and then a final gunshot four or five seconds later.  (Doc. 24-2 at ¶ 4; Doc. 24-3 at ¶ 4.)

While it is undisputed that the shot to Mr. Ayala's "rear left body" caused the injury to his spine, (Doc. 21-8 at 3; Doc. 21-9 at 4-5; Doc. 26-2 at ¶ 3), the medical witnesses could not say whether this shot occurred while Mr. Ayala was standing or lying.  (Doc. 21-8 at 5-6; Doc. 21-9 at 8.)  However, the medical evidence is undisputed that Mr. Ayala is not a competent witness as to when he received the paralyzing injury.  It is undisputed that Mr. Ayala passed out when he fell to the ground.  (Doc. 21-2 at 18-21; Doc. 26-3 at 5-8.)  Since Mr. Ayala was not conscious while he was lying down, he obviously cannot testify as to what happened while he was lying down.  The medical evidence is also undisputed that Mr. Ayala would not have felt the impact of the bullet that injured his spine.  (Doc. 26-2 at ¶ 7.)  Indeed, Mr. Ayala said he was shot at least seven times, but he felt only five of those shots.  (Doc 21-2 at 13.)  Since Mr. Ayala could not be expected to feel the paralyzing shot at any time, his failure to feel such a shot while he was standing up or falling does not support the inference that there must have been a "last shot" which occurred after he fell.  His testimony that he was not shot in the back while standing or falling is speculative.

10

Even if that testimony was sufficient to establish that a "last shot" was fired while Mr. Ayala was on the ground, the evidence is insufficient to establish such a shot occurred after a "clear break." Two nearby residents testified that they heard gunshots and then after a pause of four to five seconds, they heard a final gunshot. (Doc. 24-2 at ¶ 4; Doc. 24-3 at ¶ 4.) This testimony speaks only to the timing of the shots and does not provide any evidence of where Mr. Ayala was located or what the circumstances were when Officer Wolfe fired the final shot.

> In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer. For that reason, minor discrepancies in testimony do not create a material issue of fact in an excessive force claim, particularly when, as here, the witness views the event from a worse vantage point than that of the officers.

*Anderson,* 247 F.3d at 130-31. There remains no evidence that Officer Wolfe was aware at the time of this "last shot" that Mr. Ayala was paralyzed and no longer had access to the gun.

Viewed in the light most favorable to Mr. Ayala, the evidence does not support the inference that Officer Wolfe shot Mr. Ayala after he fell to the ground; even if it does, it does not show that Officer Wolfe knew before he fired the last shot that the danger to him had clearly and unmistakably passed. *See Elliott,* 99 F.3d at 644. Omniscience is not expected of a lone officer on a dark street after a nearby armed robbery who is involved in a short and violent confrontation with a man who has pulled a gun on him. *See id.* "The Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Id.* at 641.

Mr. Ayala's claim that the "last shot" constitutes excessive force cannot survive summary judgment. Even if Mr. Ayala's evidence is sufficient to get to the jury on the question of excessive force, Officer Wolfe is entitled to the benefit of qualified immunity. A reasonable officer would not have believed he was violating the clearly established constitutional rights of Mr. Ayala under the circumstances Officer Wolfe was facing. *See Figg*, 312 F.3d at 635.

11

B.  THE *MONELL* CLAIM AGAINST LPD

Mr. Ayala also brings a 28 U.S.C. § 1983 claim against LPD under *Monell*, 436 U.S. 658, for having a policy and custom of permitting and encouraging its officers to use excessive force and otherwise violate citizens' rights. (Doc. 1 at ¶¶ 40-51.) However, Mr. Ayala admits that he lacks the evidentiary support for this claim. (Doc. 16 at ¶ 1.) Additionally, in his reply brief Mr. Ayala states that on summary judgment, he "does not persist in his allegation that LPD committed a *Monell* violation as alleged in Count II of his original Complaint." (Doc. 24 at 13.) The Court therefore enters summary judgment in LPD's favor on this claim.

C.  THE STATE LAW CLAIMS AGAINST OFFICER WOLFE

Mr. Ayala brought several state law claims against Officer Wolfe in his individual capacity: battery, negligence, gross negligence, and intentional infliction of emotional distress. (Doc. 1 at ¶¶ 52-78.) In North Carolina, "a municipality is immune from torts committed by an employee carrying out a governmental function," and "[t]he public immunity doctrine protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." *Turner v. City of Greenville*, 197 N.C. App. 562, 566, 677 S.E.2d 480, 483 (2009) (internal quotation marks omitted). "[A]n official may be held liable when he acts maliciously or corruptly, when he acts beyond the scope of his duties, or when he fails to act at all." *Id.* (internal quotation marks omitted). As discussed above, the evidence shows Officer Wolfe's actions were reasonable, and there is no evidence that Officer Wolfe acted maliciously or corruptly. Officer Wolfe is entitled to summary judgment on Mr. Ayala's state law claims.

D.  MR. AYALA'S MOTION FOR LEAVE TO AMEND COMPLAINT

Rule 15(a) of the Federal Rules of Civil Procedure permits a party to amend its pleadings and "the court should freely give leave when justice so requires." However, "leave to amend is not automatic and is within the sound discretion of the court." *Shanks v. Forsyth Park Auth.,*

12

Case 1:11-cv-00624-CCE-LPA   Document 27   Filed 08/23/12   Page 12 of 14

*Inc.*, 869 F. Supp. 1231, 1238 (M.D.N.C. 1994). A court should deny leave to amend "only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or amendment would be futile." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

Mr. Ayala proposes to amend his complaint (1) to delete the *Monell* claim against LPD; (2) to add a claim that the initial detention of Mr. Ayala violated the Fourth Amendment and constituted false imprisonment; and (3) to add new excessive force and state law claims against LPD in its official capacity alleging waiver of sovereign immunity based on the existence of an insurance policy. (Doc. 16.)

To the extent Mr. Ayala seeks to add a new claim arising out of the initial detention, such an amendment would unfairly prejudice the defendants. While delay alone is an insufficient reason to deny a motion to amend, the further along the case, "the more likely it is that the amendment will prejudice the defendant." *Matrix Capital*, 576 F.3d at 193. Here, the events at issue occurred over two years ago and the lawsuit has been pending for over a year. The motion to amend was filed only after the discovery deadline had long since passed, as had the date to disclose experts. The parties have been deposed; in fact, Officer Wolfe was deposed regarding his stop of Mr. Alaya almost four months before Mr. Ayala moved to amend his complaint. (Doc. 24-7 at 1; Doc. 16 at 3.) Defendants, then, concluded discovery without any indication that the initial detention of Mr. Ayala would be challenged.

The focus of the case to date has been on what happened after Mr. Ayala was frisked. The new claim would shift that focus to what happened before the frisk, raising entirely different factual and legal issues. *See Mayfield v. NASCAR*, 674 F.3d 369, 379-80 (4th Cir. 2012) (affirming denial of a motion to amend where "the new allegations and causes of action [arose] out of an entirely new event and nucleus of facts" (internal quotation marks omitted)); *Laber v.*

13

*Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (holding that an amendment may be prejudicial if it "raises a new legal theory that would require the gathering and analysis of facts not already considered by the defendant" (alterations omitted)).

To the extent the motion seeks to delete the *Monell* claim against LPD, the motion is moot. As noted *supra*, the Court has granted the defendant's motion to dismiss this claim. To the extent Mr. Ayala seeks to add a new claim against LPD in its official capacity, the amendment would be futile given the lack of evidence supporting Mr. Ayala's excessive force claim, *see Matrix Capital*, 576 F.3d at 193, and would prejudice the defendant by essentially adding a new party after discovery has been completed. *Mayfield*, 674 F.3d at 379-380.

Mr. Ayala's Motion for Leave to Amend Complaint, (Doc.16), is denied.

### III. CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendants' Motion for Summary Judgment, (Doc. 19), is GRANTED, and Plaintiff's Motion for Leave to Amend Complaint, (Doc. 16), is DENIED.

This the 23rd day of August, 2012.

_____
UNITED STATES DISTRICT JUDGE